**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| SHARON BRUCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 3:07-CV-361-TS |
| ) | |
| VAHALA FOAM, INC., ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

The Plaintiff, Sharan Bruce,[1] alleges that while she was temporarily assigned to work at Defendant Vahala Foam, Inc., her supervisor, Bob Vahala, promised her that he would hire her for a permanent position if she had sex with him. She further alleges that, after having sex with Vahala on two different occasions, she told him that she did not want anything to do with him and, as a result, her employment was terminated. The Plaintiff invokes the protections of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

Vahala maintains that their sexual encounters were consensual and that he never indicated that their relationship would have any impact on her temporary placement at Vahala Foam. The Defendant argues that it was David Vahala, who is Bob Vahala's brother and the owner of Vahala Foam, who decided to end the use of temporary employees, and that he did so solely in response to decreased production demands. The Defendants submit that David was not even aware of Bob Vahala's sexual relationship with the Plaintiff.

The Defendant has moved for summary judgment on the Plaintiff's claim, arguing that

---

[1] Although the case caption spells the Plaintiff's first name "Sharon," her declaration uses the spelling "Sharan."

she cannot make out a *prima facie* case of *quid pro quo* sexual harassment. In response, the Plaintiff argues that she was subjected to a hostile work environment created by her supervisor. She contends that her employer is liable for the conduct, either because it led directly to her discharge or because it is too late for the Defendant to assert the affirmative defense that applies to hostile work environments created by supervisors. In its reply brief, the Defendant claims that the Plaintiff's complaint did not put it on notice that the Plaintiff was asserting a hostile work environment claim. The Defendant argues that, even so, the Plaintiff cannot make out a claim of sexual harassment or establish employer liability.

For the reasons stated in this Opinion, the Defendant's motion for summary judgment is denied.

## BACKGROUND

On August 1, 2007, the Plaintiff sued the Defendant pursuant to Title VII, alleging that "she was sexually harassed and suffered a tangible employment action as a result thereof." (Pl. Compl. ¶ 1.) The Complaint described the conduct of Bob Vahala, who the Plaintiff identified as her boss. She alleged that she was harassed by Vahala's graphic text messages and demands for sex, to which she eventually succumbed, that she was denied a full-time, salaried position, and her employment terminated when she refused to continue to have sex with Vahala.

On September 4, the Defendant answered the Complaint.

After the conclusion of discovery, the Defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The parties completed briefing on the motion for summary judgment on July 1, 2008, and the matter became ripe for the Court's consideration.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party

3

as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## STATEMENT OF FACTS

The Defendant company is a foam fabrication business, providing foam for a variety of products. The demand for the Defendant's product increased in conjunction with the emergency temporary housing needs created by Hurricane Katrina in 2005. To fill the labor shortage created by this demand, the Defendant sought placement of temporary workers from Specialized Staffing Solutions. On November 8, 2005, Specialized Staffing Solutions placed the Plaintiff with the Defendant in a temporary capacity as a foam gluer.

The Plaintiff's supervisor at the Defendant company was Bob Vahala. Shortly after she was placed with the Defendant, Vahala wrote his cell and home phone numbers on the Plaintiff's time card. Vahala then initiated contact with the Plaintiff by sending a text message to her cell phone. The Plaintiff does not know how Vahala got her cell phone number. The Plaintiff estimates that Vahala texted her about three times a day. (Pl. Dep. 111.) She believed, at first, that he was trying to be friendly because she was new to the area and did not know many people.

4

(Pl. Dep. 111.)

The Plaintiff testified that she responded to some of the texts, but that she did not always see them because they were received later at night when she did not use her phone. (Pl. Dep. 111.)  The Plaintiff saved some of these texts, but did not save any of her responses. She believes that some of the messages did not save or were erased from her phone.

The first saved messages, from December 23, 2005, include an invitation for the Plaintiff to come to Vahala's house. (Pl. Dep. 76–78.) He comments that he should not drive. The Plaintiff does not remember if she responded to these messages or communicated with him before he asked her to come over. On December 27, he wrote "And I'll hold it to you." (Pl. Dep. 75.) The Plaintiff believes that this text was in response to her indicting to Vahala that she might come over, but that she did not actually go to see him. On December 28 there are messages referring to food. Vahala asks, "How about beef and potatoes" and  "No sausage for you. Did that offend you?" (Pl. Dep. 74–75.) The following day, he asks the Plaintiff if she is "alone and bored." (Pl. Dep. 74.) Other messages from this date include, "BS. Come visit now and I'll prove that I am—I'm a wimp. I'm not good at this," "You're hot," "You're pretty, you're sweet, great body, and an ass that won't quit. You're hot," and "So are you on your way over?" (Pl. Dep. 69–71.) On December 31, Vahala texts the Plaintiff to ask how she is spending the New Year holiday, and also asks the Plaintiff, "My plans don't sound good?" (Pl. Dep. 68.) The next saved text, from January 7, 2006, is an invitation for the Plaintiff to "come over for dinner." (Pl. Dep. 68.) The next texts read, "Maybe breakfast," and "I've got Xmas at bro's at two since they were in florida. After?" (Pl. Dep. 66–67.) On the evening of January 13, Vahala wrote, "Fell asleep. I will call you in a few." (Pl. Dep. 64.) On January 29, Vahala again invites the Plaintiff to come

over, saying that he should not drive. (Pl. Dep. 63.)

There is no further evidence of the substance of any communication until March 2006. The message saved from that date asks: "How about lunch or something tomorrow? Sorry." (Pl. Dep. 63.) Two messages do not indicate a date, "Are you as horny as I am?" and "I may be tripping, but you didn't answer my question." (Pl. Dep. 62.) There are two messages from May 2006, "What if I wanted some mo?" and "When I feed you, it will be the whole thing." The Plaintiff testified that she did not understand, or remember, what these message were about. (Pl. Dep. 57–58.) Vahala also asked the Plaintiff, "What's up in Vegas?" but she indicates that she does not remember what this was referring to and that she has never been to Las Vegas. (Pl. Dep. 57.) There are no saved texts that date later than May 24, 2006.

The Plaintiff testified that she did not respond to all of the texts, but did respond to others. She acknowledged that some of the messages from Vahala appeared to be responsive, or part of an ongoing conversation. She also indicated that she told Vahala, when he would ask her, that she could not come over.

Q.   Were you guys communicating text message-wise back and forth at that point?

A.   Not really. I mean, all—I mean, he would ask me to come over, and I would text him back and tell him I couldn't.

(Pl. Dep. 67) (referring to messages received in January 2006.)

The Plaintiff testified that, on June 18, 2006, Vahala's advances culminated in sex: "One day he asked me to come over, and I finally decide to come over. He—we talked at work. He said that he would—he would hire me in if I lay down with him. I wanted to keep my job, so that's what I did." (Pl.  Dep. 113.) When asked how she knew to go to his house, the Plaintiff

6

responded, "He asked me all the time to come over." (Pl. Dep. 113–14.) She also stated that they talked at work before about Vahala hiring the Plaintiff if she had sex with him. (Pl. Dep. 113, 116.)

Two or three weeks later, the Plaintiff again went to Vahala's house and had sex with him.[2] There are no text messages in the Plaintiff's phone related to this incident. Vahala called the Plaintiff on her home phone number around 12:30 AM on a week night to ask her to come to his house. (Pl. Dep. 124–25.) The Plaintiff had an alcoholic drink at Vahala's house, had sex with him, and left around 2:00 AM. (Pl. Dep. 126.)

A text message from Vahala dated July 19 read, "Me too. Got a great ass to grab." (Pl. Dep. 120–21.) There is no evidence in the record as to the context of this message.

The Plaintiff described the end of the relationship in her deposition: "I just basically told Bob I didn't want to, you know, mess around anymore. He didn't keep up on his end. Say he would hire me in, and he let me go." (Pl. Dep. 130.)

In July 2006, the demand for Vahala Foam's product returned to pre-Katrina levels. During a management meeting in late July or early August, David Vahala informed the supervisors that the company needed to reduce its workforce, and directed them to end the placement of temporary employees. As a result of this directive, the assignments of the temporary employees were terminated. An exception was made for a contour machinist who David Vahala decided to retain because his job required specialized skill that no other Vahala Foam employee had. These placements were terminated in August 2006. David Vahala was not

---

[2] During the Plaintiff's deposition, she initially only recalled having sex with Vahala once. She later remembered that they had sex a second time.

aware of any sexual relationship between his brother and the Defendant.

According to the Plaintiff, Bob Vahala called the Plaintiff into his office and told her that she was let go. The Plaintiff contends that he gave her no explanation for this. Vahala's declaration indicates that, in response to David Vahala's directive, he informed the Plaintiff in August 2006 that she would be terminated. An attachment to his declaration indicates that the termination took effect around September 7, 2006.

## DISCUSSION

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When an employer demands sexual favors from an employee in return for job benefits, discrimination with respect to terms or conditions of employment is explicit. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id.* at 753–54. An employer also violates Title VII if it is responsible for a hostile work environment that is severe or pervasive. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Thus, Title VII is violated either by explicit or constructive alterations in the terms or conditions of employment. *Ellerth*, 523 U.S. at 752. From these recognized types of discrimination have come the terms "*quid pro quo*" and "hostile work

8

environment."

The Equal Employment Opportunity Commission's description of conduct that is harassment in violation of Title VII includes both kinds of discrimination:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a).

The Plaintiff maintains that this case involves both types of discrimination. She contends that her refusal to continue having sex with Vahala resulted in her termination—a tangible employment action. She also argues that, even if a jury does not find that her termination was the result of her refusals, that her supervisor's action created an actionable hostile work environment. She submits that under either scenario, the Defendant employer is liable.

Liability attaches to an employer for *quid pro quo* discrimination because "tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." *Ellerth*, 524 U.S. at 762. When an immediate supervisor's actions do not culminate in a tangible employment action, the employer is still vicariously liable to the victimized employee, but the defending employer may raise an affirmative defense. *Id.* at 765. The defense requires that the employer establish by a preponderance of the evidence that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and also, that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities

9

provided by the employer or to avoid harm otherwise. *Id.*[3]

The Defendant argues that the Plaintiff's claims must fail under either theory of recovery. It submits that she has not presented evidence from which a jury could determine that the Plaintiff considered Vahala's conduct unwelcome. The Defendant also argues that there was no link between the Plaintiff's termination and her participation, or refusal to participate, in sexual conduct. In defense of the hostile work environment claim, the Defendant submits that the Vahala's conduct was not sufficiently severe or pervasive. Finally, it argues that even if the Plaintiff could make out a prima facie claim for a hostile work environment, it has satisfied the elements of the affirmative defense.

**A.  Unwelcome Conduct**

Because unwelcomeness is a necessary element of the sexual harassment claims advanced by the Plaintiff, the Court will discuss it first. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"); *McPherson v. City of Waukegan*, 379 F.3d 430, 437–38 (7th Cir. 2004) (reciting as one element of hostile work environment claim that the plaintiff be the subject of unwelcome sexual harassment); *Bryson v. Chi. State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996) (setting forth as one factor in test for *quid pro quo* harassment that the sexual advances were unwelcome). The fact that the Plaintiff eventually engaged in voluntary sex with Vahala does not impact the analysis on this element. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a

---

[3] The affirmative defense is commonly referred to as the *Ellerth/Faragher* affirmative defense for the Supreme Court cases recognizing it.

sexual harassment suit brought under Title VII." *Id.* The correct inquiry is whether the plaintiff "by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.* In making this inquiry, a court must examine the totality of circumstances, such as the nature of the sexual advances and the context in which they occurred. *Id.*

In support of her claim that she did not welcome Vahala's advances, the Plaintiff submits a declaration stating that his "sexual advances toward [her] were unwelcome" and she found them to be "offensive" and "inappropriate" because he was her boss. (DE 27-3 ¶ 2.) She also states that had Vahala not told the Plaintiff that he would hire her as a regular full time employee if she had sex with him, she would not have had sexual relations with him. (DE 27-3 ¶ 3.) The Defendant argues that these statement are inadequate to show that the Plaintiff indicated to Vahala, or to anyone else at the company, by word or action that she considered his conduct unwelcome. The Defendant notes that the Plaintiff engaged in ongoing text message conversations with Vahala without any indication in the record that she considered his text communications unwelcome.

The evidence on this point is sparse. Other than the Plaintiff's statement that she did not always respond to Vahala when he sent her a message, there is no testimony from either the Plaintiff or Vahala that specifically describes the Plaintiff's reaction to Vahala's text messages or phone calls. Nor are there any records of the Plaintiff's text message responses to Vahala. But there is also no indication that the Plaintiff instigated or encouraged the contact or that she otherwise participated in provacative conduct at work. *Cf. Reed v. Shepard*, 939 F.2d 484, 491 (7th Cir. 1991) (finding that unwelcomeness element not satisfied because evidence showed the

11

plaintiff's "enthusiastic receptiveness to sexually suggestive jokes and activities" and that her "preferred method of dealing with co-workers was with sexually explicit jokes, suggestions, and offers"). The Court notes that the context in which many of Vahala's comments occurred could have affected the Plaintiff's response, or lack of one. A reaction to comments made in person may be understandably different, and more immediate, than responses to text messages, which can be more readily ignored. Moreover, the evidence shows that Vahala asked the Plaintiff to come to his house numerous times over the course of several months before she actually did so, which a reasonable jury could consider as evidence that she did not welcome his advances. She also testified that when he asked her to come over, she would tell him that she could not.

The record is far from developed on this issue. Indeed it is difficult to discern whether the Plaintiff was unsettled about the Vahala's conduct, as opposed to being upset that she did not get hired as a full-time employee because "[h]e didn't keep up on his end." (Pl. Dep. 130.) But there is enough to place the dispute before a jury. In many cases, whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations reserved for a jury. *Vinson*, 477 U.S. at 68.

**B.  Tangible Employment Action**

In line with traditional agency principles, an employer may be held vicariously liable for the acts of those who can be considered "an employer's proxy," such as "a president, owner, proprietor, partner, corporate officer, or supervisor 'hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (citing *Faragher v. City of Boca*

12

*Raton*, 524 U.S. 775, 789–90 (1998)). Therefore, employers are vicariously liable for an actionable hostile environment created by a supervisor with authority over the victimized employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000). If the harassment culminated in tangible employment action against the employee, the employer is strictly liable for the supervisor's acts. *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 760–61. However, if the supervisor did not take any tangible employment action against the employee the employer may raise an affirmative defense to liability or damages. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *see also Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) ("Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action.") Therefore, the Court must determine whether the Plaintiff suffered a tangible employment action.

The parties do not dispute that the Plaintiff's discharge from further services at Vahala Foam was a tangible employment action. They dispute whether the discharge was the result of the Plaintiff's informing Vahala that she no longer wanted to have sex with him. The Defendant argues that David Vahala, who was not even aware of his brother's relationship with the Plaintiff, decided to terminate the unskilled temporary positions in response to decreased production demands.

To dispute this, the Plaintiff points to the fact that the other two temporary employees who lost their positions were terminated before the Plaintiff was. One employee was terminated around August 10 and the other around August 17, but the Plaintiff was not terminated until

13

September 7. She contends that no explanation was given "for why [the Plaintiff] was allowed to work for several more weeks than the other temporary employees." (Pl. Resp. Opp. Summ. Jgmt. 11, DE 26.) She argues that the inference from this fact is that her employment was extended because she engaged in sex with Vahala. She then argues that a similar inference can be drawn regarding her refusal to continue to engage in sexual relations with Vahala, which she communicated sometime in or after July.

The Plaintiff's argument is difficult to grasp. The significance the Plaintiff attempts to place on the short extension of employment is not supported by the timeline the Plaintiff presents. Her refusal to have sex was not an intervening event between David Vahala's decision to let all temporary employees go and the Plaintiff's termination. In fact, that her refusal of Vahala's advances occurred in July, but she was not terminated until September, tends to support the conclusion that she was not discharged for shunning Vahala. The Plaintiff has no evidence that draws into dispute the evidence that Vahala's termination of the Plaintiff was at the directive of David Vahala and that it was completely unrelated to Vahala's sexual relationship with the Plaintiff. The discussion by the Seventh Circuit in *Jackson v. County of Racine*, is fitting:

> It is important to distinguish between the real loss of a promotion (a tangible action) and the disappointment that follows when it turns out that there is no tangible benefit available at all and that the supervisor has been lying in order to win sexual favors. [The plaintiff's] testimony could establish the latter fact, but that is not what *Ellerth* requires for strict liability.

474 F.3d 493, 501 (7th Cir. 2007). Here, the Plaintiff has not presented any competent evidence that the permanent full-time position that Vahala promised to her actually existed. At the most, the evidence establishes that Vahala lied about his ability to offer her a job in order to convince her to have sex with him. As *Jackson* explains, this is not evidence that the Plaintiff's refusal to

have sex resulted in a tangible employment action.

**C.  Hostile Work Environment—Sufficiently Severe or Pervasive**

Because the Plaintiff did not suffer a tangible job detriment for refusing to comply with Vahala's demands, she must proceed under a hostile work environment theory. If she cannot establish the elements of this claim, the Defendant may raise an affirmative defense.

Sexual harassment is actionable under Title VII only if it is so severe and pervasive that is alters the conditions of the plaintiff's employment and creates an abusive working environment. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). In order to be actionable under Title VII, a hostile work environment must be both objectively and subjectively offensive, "such that a reasonable person would find the environment hostile or abusive, and . . . that the victim in fact did perceive [it] to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

In evaluating whether a workplace is hostile, a court must look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. A court should look at all the circumstances and no single factor is required. *Id.*

On the objective side, drawing the line between actionable and nonactionable sexual harassment "is not always easy." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995); *see also Robinson v. Sappinton*, 351 F.3d 317, 329 (7th Cir. 2003) (noting that inquiry is fact intensive and there is no "mathematically precise test").

15

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express of implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers . . . . It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.

*Baskerville*, 50 F.3d at 430–31 (citations omitted).

Vahala's outright solicitations for sex, which included explicit references to the Plaintiff as having "a great body" and an "ass that would not quit," is more severe than the type of "occasional vulgar banter" that falls short of a hostile work environment. The Seventh Circuit said as much in *Quantock v. Shared Marketing Servs., Inc.*, 312 F.3d 899, 904 (7th Cir. 2002), where a the president of the company made an outright solicitation of three sex acts from the plaintiff during a business meeting. In *Quantock*, the court also stressed the offender's "significant position of authority at the company and the close working quarters within which he and [the plaintiff] worked" as evidence that a reasonable jury could consider to determine that the sexual propositions were sufficiently severe as an objective matter to alter the plaintiff's terms of employment. *Id.* There is no evidence that the Plaintiff, who was a foam gluer, worked in particularly close proximity to Vahala. However, he did hold a significant position of authority as her supervisor and the brother of the company's owner. Moreover, Vahala boosted the significance of his authority when he indicated to the Plaintff, through his *quid pro quo* promise, that he could fill permanent employment positions at the company. There is evidence that the Plaintiff believed that obtaining a permanent position was equivalent to keeping the job she already had (Pl. Dep. 113, "He said that he would—he would hire me in if I lay down with him. I wanted to keep my job, so that's what I did."), which is consistent with the fact that her

placement at the company was through a temporary agency.

The frequency of the solicitations also supports that it was objectively offensive. Vahala's solicitations were not limited to a single incident. *Cf. Quantock*, 312 F.3d at 904 n.2 (observing that, while the solicitations occurred during a single incident, this did not defeat the plaintiff's claim because abusive conduct does not need to be both severe and pervasive; only one or the other) (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000)). The first saved text message containing an invitation for the Plaintiff to come over to Vahala's house was in December 2005. The Plaintiff testified that Vahala sent an average of three text messages a day, and that he often asked her to come over in text messages, during telephone conversations, and while they were at work. The first time that the Plaintiff complied with Vahala's request was in June 2006, nearly six months after he first propositioned her.

Both the severity and the frequency of the conduct create a genuine issue of triable fact on the objective component of the hostile work environment claim. This case involves far more than a few off-hand comments with sexual connotations; the Plaintiff's supervisor actively sought sexual encounters with the Plaintiff, enticing her with the promise of permanent employment. Vahala's disclaimer that he made any such promise creates an issue of fact for a jury to determine. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants").

Despite the fact that a jury could determine that the work environment was objectively hostile, there is little evidence from which to evaluate the subjective component of the Plaintiff's claim. For example, the Plaintiff does not indicate that she avoided her supervisor at work, that

17

his conduct caused her to want to leave, or that she complained to anyone. However, the Plaintiff does state in her declaration that Vahala's advances were unwelcome, offensive, and inappropriate. She also states that she only agreed to have sex with Vahala because she wanted to obtain full time employment. A jury could determine that she perceived her work environment as hostile.

### D.  Affirmative Defense

Even if the Plaintiff experienced unlawful sexual harassment, there must still be a basis for employer liability. Because no tangible employment action was taken against the Plaintiff, the Defendant may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *Gentry v. Export Packaging Co.*, 238 F.3d 842, 846 (7th Cir. 2001). The employer must establish (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* (citing *Ellerth*, 524 U.S. at 765); *see also Faragher*, 524 U.S. at 807.

In support of the first prong of the affirmative defense, the Defendant presents a copy of its employee handbook dated October 23, 2000. The handbook contains a provision describing prohibited harassment by supervisors or fellow employees, and advising employees to report unwelcome harassment to a supervisor or plant manager. (DE 29-2.) The handbook is the only evidence that the Defendant presents in support of the first prong of the affirmative defense.

The existence of this handbook, by itself, is not sufficient to establish by a preponderance

of the evidence that the Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *Faragher,* 542 U.S. at 808 (holding that an antiharassment policy that is not disseminated to employees is insufficient to meet the first element of the affirmative defense). There is no evidence in the record that the Plaintiff received a copy of the handbook or that its provisions were otherwise posted and available to employees. It has not been established that employees were aware of the mechanisms to complain of harassment, or that supervisors were trained in preventing harassment or dealing with employee complaints. The Defendant, despite being in the best position to know what remedial procedures it offers to employees and how those procedures operate, does not present any evidence elaborating on this. It is not even clear that the policy was actually implemented.

On the record before the Court, the Defendant has not established that it took reasonable care to prevent and correct sexually harassing conduct, and it is not necessary for the Court to address the second prong of the defense.[4]

**E. Conclusion**

The purpose of summary judgment is to determine whether there is sufficient evidence for a case to be presented to a jury. The Court does not examine the credibility of the witnesses

---

[4] The Plaintiff contends that because the Defendant did not raise the affirmative defense in support of its motion for summary judgment, that the argument has been waived for purposes of summary judgment. (Pl. Resp. 12, DE 26.) While the Defendant's motion was not granted on the basis of the affirmative defense, the matter requires further discussion. The Court notes that the Plaintiff's complaint alleged that the sexual harassment led to a tangible employment action. The affirmative defense does not apply in such a case and, presumably, this is why the Defendant did not advance it. However, as it has been the Defendant's position throughout the litigation that Vahala's conduct did not lead to the Plaintiff's termination, it should have known that the defense was available. Although the Plaintiff is now on notice that the Defendant intends to assert the defense, the Defendant has yet to move to amend its answer to assert the affirmative defense. Additionally, if such a motion to amend is made, and ultimately granted, it may warrant additional discovery.

or the weight of the evidence, and must construe all facts and take all reasonable inferences to favor the nonmoving party. In this case, there are two very different stories of what transpired that led to the Plaintiff having sex with her supervisor, and it will be the jury's task to determine whose version is accurate.

**ORDER**

For the foregoing reasons, the Defendant's motion for summary judgment [DE 24] is DENIED. The telephonic ruling/scheduling conference set for September 15, 2008, is VACATED. A scheduling conference is SET for Wednesday, August 13, 2008, at 11:30 AM. The Court will initiate the call.

SO ORDERED on August 4, 2008.

        s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION